UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SAN MATEO,<br>    Plaintiff,<br>  v.<br>CSL LIMITED, et al.,<br>    Defendants. | Case No. 10-cv-05686-JSC<br><br>**ORDER DENYING DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 133 |

In this California-law antitrust action, Plaintiff County of San Mateo alleges that certain manufacturers of pharmaceutical products derived from human blood plasma conspired to restrict the supply of such products thereby causing Plaintiff, among others, to pay artificially high prices for the products. Now pending before the Court is the motion of Defendants CSL Limited, CSL Behring LLC, CSL Plasma (collectively "CSL"), Baxter International Inc. ("Baxter"), and Plasma Protein Therapeutics Association for partial summary judgment. (Dkt. No. 133.) Defendants contend that Plaintiff, as a matter of law, may not seek damages from Defendants for blood plasma products purchased from rival non-conspirators at prices that were inflated by Defendants' anti-competitive conduct. After carefully considering the parties' submissions, and having had the benefit of oral argument on August 14, 2014, the Court DENIES the motion.[1]

**SUMMARY JUDGMENT EVIDENCE**

CSL and Baxter manufacture the plasma-derivative protein therapies IVIG and albumin, among others. These therapies are derived from human blood plasma collected from donors and sellers at U.S. collection centers. CSL and Baxter control approximately 60 percent of the U.S.

---

[1] The parties have all consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

market for all plasma-derivative protein therapies. The therapies, which are necessary to treat numerous life-threatening medical conditions, are sold by CSL and Baxter either directly to healthcare providers or to distributors who then sell to healthcare providers. Plaintiff bought its IVIG and albumin indirectly from distributors ASD Specialty Healthcare and Blood Centers of the Pacific.

Plaintiff alleges that beginning in 2003 CSL and Baxter, along with the trade group Plasma Protein Therapeutics Association, conspired to reduce the supply of plasma-derivative protein therapies. This conspiracy caused artificial shortages of IVIG and albumin, which in turn caused inflated prices for those therapies that were paid by Plaintiff. At least for purposes of this motion, the parties do not dispute that Plaintiff was unable to avoid the price increases by, for example, purchasing substitutes for IVIG and albumin.

The vast majority of the IVIG and albumin Plaintiff purchased was manufactured by non-defendants that are not alleged to have participated in any conspiracy. While Plaintiff purchased some IVIG and albumin from CSL, it made no such purchases from Baxter. Plaintiff contends that the IVIG and albumin purchased from non-conspirators were nevertheless purchased at supracompetitive prices caused by Defendants' conspiracy to reduce supply.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "[T]he moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial . . . and persuade the court that there is no genuine issue of material fact." *Id.*

If the "moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. If the nonmoving party fails to do so, "the moving party wins the motion for summary judgment." *Id.* "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id.* In deciding whether there exist genuine issues of material fact, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

Plaintiff's only remaining claim is a cause of action under the Cartwright Act (California Business and Professions Code Section 16700 *et seq.*), California's antitrust statute.[2] Defendants' motion for partial summary judgment seeks to bar Plaintiff from recovering as damages any overcharges[3] Plaintiff incurred in purchasing IVIG and albumin from non-conspirators, even if Plaintiff would have paid a lower price in the absence of Defendants' anticompetitive conduct. These so-called "umbrella damages" are based on Plaintiff's theory that Defendants' conspiracy to decrease supply created a "price umbrella" that spread the artificially inflated price throughout the market. Defendants argue that umbrella damages are precluded as a matter of law for two reasons: 1) they are "unacceptably speculative" (Dkt. No. 133 at 6), and 2) Plaintiff lacks standing to seek such damages. Although the two issues are somewhat interconnected, the Court addresses each separately.

    **A.**    **Whether Umbrella Damages are Unduly Speculative Under the Cartwright Act as a Matter of Law**

Section 16750(a) of the Cartwright Act authorizes anyone "injured in his or her business or property" by actions forbidden under the Cartwright Act to recover three times the "damages sustained." The California Supreme Court has remarked that this text, which has been virtually unchanged from the original version of the act passed in 1907, "says nothing about how the injury

---

[2] Plaintiff's original complaint included federal antitrust claims as well as class-action allegations. The federal claims were dismissed during Multidistrict Litigation ("MDL") proceedings, and Plaintiff voluntarily dropped its class allegations following remand from the MDL.
[3] An "overcharge" is the "difference between the price actually paid and the price that would have been paid 'but for' the unlawful conduct multiplied by the quantity purchased." 12 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 395, p. 376 (3d ed. 2007) (hereinafter Areeda).

or damages are to be quantified." *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 770 (2010). Nonetheless, under California law (as under federal law), damages cannot be awarded in antitrust cases upon "sheer guesswork or speculation." *In re Wholesale Electricity Anti-Trust Cases I & II*, 147 Cal. App. 4th 1293, 1309 (2007) (internal quotation marks omitted). Rather,

> a plaintiff seeking such damages must establish to a reasonable probability that there was some causal connection between defendant's wrongful act and the damages alleged, such as lost profits. Once that has been accomplished, the jury will be permitted to act upon probable and inferential proof and to make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.

*Id.* (citations and internal quotation marks omitted).

Defendants, relying solely on federal caselaw, contend that calculating the overcharge that Plaintiff incurred when purchasing the products from Defendants' competitors is "unacceptably speculative." Defendants assert that Plaintiff's status as an indirect purchaser in a multi-tiered distribution system causes this undue speculation; specifically, they contend that any fact-finder would have to speculate about whether, and to what extent, a rival non-conspirator manufacturer's price increase was based on the conspiracy, "as opposed to the myriad and complex other variables that factor into individual pricing decisions." (Dkt. No. 136 at 3.) The alleged speculation "would only increase when the fact-finder would have to run the analysis again to determine what portion, if any, of the *distributor's* price could be attributed to the conspiracy." (*Id.* (emphasis added).)

The Court is not persuaded. The overcharge damages flowing from purchases from non-conspiring rivals are based on the same calculation that must be made for damages flowing from purchases from Defendants; that is, the amount over the price that would have occurred in the absence of the anticompetitive conduct. *See In re Uranium Antitrust Litigation*, 552 F. Supp. 518, 524-55 (D.C. Ill. 1982) (rejecting defendants' argument that umbrella damages should be barred as a matter of law and reasoning that "this calculation, whatever the difficulties it poses, is no more problematic than determining damages in any price-fixing case."). If it would be too speculative as a matter of law to make this computation with respect to non-conspiring rivals, it would also be too speculative to make the same calculation in regards to cartel members. Defendants, however,

4

do not challenge as inherently speculative Plaintiff's claim for damages against them. Nor can they. California law, in contrast to federal law, allows indirect purchasers in a multi-tiered distribution chain to sue and collect damages, such as overcharges, from antitrust defendants. *See* Cal. Bus. & Prof. Code § 16750(a) (allowing suit by any injured person "regardless of whether such injured person dealt directly or indirectly with the defendant"); *see also Union Carbide Corp. v. Superior Court*, 36 Cal. 3d 15, 19–20 (1984) (explaining that § 16750 was amended to repudiate the *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) bar against indirect purchaser recovery).

        To be sure, calculating the overcharge is no simple feat—and the task may ultimately be insurmountable for Plaintiff. A leading antitrust treatise explains that, while the actual prices paid are "usually straightforward" to establish, "the real problem arises in establishing the 'but for' price"— the price that would have been paid "but for" the unlawful conduct. Areeda at ¶ 395b, p. 383. This is particularly true in damages claims by indirect purchasers where each purchase along the chain of distribution must be examined. To reach the "but for" price at each stage, a complex damages model must be created that predicts what the price would have been in the market under competitive conditions during the conspiracy period—taking into account cost increases, as well as other market forces, that existed during the conspiracy period that may have increased prices absent the anticompetitive conduct. *See id.* at ¶ 395b, p. 383-87, ¶ 396f (providing the following as examples of factors that need to be controlled in estimating the "but for" cost: changes in costs (increased wages, rising insurance premiums, etc.), changes in demand, entry of new firms, and product improvements). Difficulty alone, however, does not render Plaintiff's damages calculation fundamentally speculative. Further, neither imprecision nor uncertainty pose a categorical bar to umbrella damages; in fact, the evidentiary standard anticipates some degree of estimation. *See Wholesale Electricity*, 147 Cal. App. 4th at 1309 ("Once [plaintiff has established causation], the jury will be permitted to act upon *probable and inferential* proof and to make a just and reasonable *estimate* of the damage based on relevant data, and render its verdict accordingly.") (emphasis added). In short, while calculating the amount of Plaintiff's umbrella damages may be inherently difficult, it does not follow that it will be impossible for Plaintiff to make a non-speculative estimation of such damages.

Nor is it impossible for Plaintiff to establish with a "reasonable probability," *id.*, that Defendants' supply restriction caused a price umbrella; that is, caused Plaintiff to incur an overcharge when purchasing IVIG and albumin from non-conspirators. To the extent Defendants contend that such a determination cannot be made with complete certainty, Defendants overstate Plaintiff's evidentiary burden. *See id.* ("[A] plaintiff seeking such damages must establish to a *reasonable probability* that there was some causal connection between defendant's wrongful act and the damages alleged . . . .") (emphasis added); *see also In re Uranium*, 552 F. Supp. at 525 ("Once it is established that nonconspirators have charged more than competitive prices, the inference that the cost increase was caused by the cartel is inescapable. Granted there will be some uncertainty regarding these calculations, but no more so than in any price fixing case where it is uncertain what price the defendants would have charged but for the antitrust violation."); *see also Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*, 512 F. Supp. 711, 719 n.9 (D.C.N.Y. 1981) ("In a market in which supply is restricted, prices move up naturally pursuant to basic laws of supply and demand.").

At bottom, Defendants' argument is that because the Ninth Circuit has held that umbrella damages are not recoverable under the Sherman Act, they are not recoverable under the Cartright Act. The Court disagrees. In *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 691 F.2d 1335 (9th Cir. 1982) ("*Petroleum Products*"), the Ninth Circuit held that umbrella damages are categorically barred under federal antitrust law because such damages are inconsistent with the Supreme Court's rationale underlying its decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

The *Illinois Brick* Court held that, in most instances, indirect purchasers—*i.e.*, purchasers of goods who did not buy directly from cartel members—are barred from seeking antitrust damages under federal law. The Court reasoned that suits from indirect purchasers created a risk of multiple liability for defendants since, under the Court's earlier ruling in *Hanover Shoe*, a direct purchaser could recover the full amount of an overcharge regardless of whether it passed on the overcharge to subsequent buyers. In a world with *Hanover Shoe* and indirect purchaser suits, "the indirect purchaser could sue to recover the same amount." *Illinois Brick*, 431 U.S. at 2067. The

6

1 Court also reasoned that the time and energy devoted to parsing the pricing decisions throughout
2 the chain of distribution disfavored allowing indirect purchaser suits. *Id.* (adopting *Hanover*
3 *Shoe*'s practical concerns "of the uncertainties and difficulties in analyzing price and out-put
4 decisions in the real economic world rather than an economist's hypothetical model, and of the
5 costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to
6 reconstruct those decisions in the courtroom") (citation and internal quotation marks omitted).

7 Although umbrella damages were not at issue in *Illinois Brick*, the *Petroleum Products*
8 court applied *Illinois Brick*'s rationale to the plaintiffs' umbrella claims for overcharges resulting
9 from their indirect purchases of gasoline at artificially inflated prices. In addition to worries about
10 double recovery, the court held that plaintiffs' umbrella damages were barred under *Illinois Brick*
11 because they were "unacceptably speculative and complex." *Petroleum Products*, 691 F.2d at
12 1340-41. The court stated:

> Under an umbrella theory, the result of any attempt to ascertain with reasonable probability whether the non-conspirators' prices resulted from the defendants' purported price-fixing conspiracy or from numerous other pricing considerations would be speculative to some degree. When the fact of a multi-tiered distribution system is imposed upon the above complex set of variables, the obstacles to intelligent inquiry become nearly insurmountable. The causal effect of each pricing decision would have to be pursued through the chain of distribution. Not only would we be required to speculate that plaintiffs were injured solely as the result of umbrella pricing, but also we would be required to sanction complex judicial inquiry into the pricing decisions of sellers remote from plaintiffs. We decline to do either, and accordingly hold that under the facts of this case, application of an umbrella theory is unwarranted.

21 *Id.* at 1341 (footnotes omitted).

22 As an initial matter, the Ninth Circuit's decision in *Petroleum Products* construing federal
23 antitrust law is not binding on this Court's interpretation of California's Cartwright Act. *See*
24 *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013) ("Interpretations of federal
25 antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given
26 that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes
27 enacted by California's sister states around the turn of the 20th century."). Further, contrary to
28 Defendants' assertion at oral argument, the absence of caselaw from the California courts

7

regarding umbrella damages does not elevate the instructiveness of federal antitrust law interpretations. The Court will not assume that umbrella damages are disallowed under California law, as under federal law, just because a California court has not addressed the issue.

*Petroleum Products* is not instructive here for several reasons. Most prominently, the court's reliance on *Illinois Brick* for the proposition that tracing overcharges through a multi-tiered distribution chain is "unacceptably speculative and complex" is inapposite to claims under the Cartwright Act because California has rejected *Illinois Brick*. *See Clayworth*, 49 Cal. 4th at 781 ("[*Illinois Brick*] evoked an immediate legislative response. Within months of the decision, Assembly Bill No. 3222 (1977–1978 Reg. Sess.) was introduced to prevent *Illinois Brick* from having any effect on judicial interpretation of the Cartwright Act."). The California Legislature, unlike the United States Supreme Court, does not believe that a plaintiff's attempt to estimate overcharges incurred through a multi-tiered distribution chain is unacceptably speculative and complex; rather, the California Legislature has expressly allowed such claims. *See* Cal. Bus. & Prof. Code § 16750(a). Thus, umbrella damages—which, as explained above, are calculated the same way as indirect purchaser non-umbrella damages—cannot be categorically barred under the Cartwright Act for failing to meet *Illinois Brick*'s benchmark for speculation and complexity. *Petroleum Products* is also unpersuasive to the extent it elevates mere uncertainty to impermissible speculation. The court's concern that determining causation to a reasonable probability would be speculative to "some degree" merely reflects the lack of absolute certainty facing the fact-finder; however, as discussed above, such uncertainty does not automatically doom a plaintiff's damages claim. *See Wholesale Electricity*, 147 Cal. App. 4th at 1309.

A court in this District has nevertheless held that, under the reasoning of *Petroleum Products*, an indirect purchaser's claims for umbrella damages arising from a multi-tiered distribution chain are barred under the Cartwright Act. *See In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2012 WL 6708866, at *6-7 (N.D. Cal. Dec. 26, 2012). For the reasons stated above, this Court respectfully disagrees with the *In re TFT-LCD* court and declines to follow its contrary holding.

At oral argument Defendants argued that the California Supreme Court's decision in *Clayworth* supports their assertion that, notwithstanding the *Illinois Brick* repealer statute, unduly complex damages are not allowed under California law. *Clayworth* adopted the *Hanover Shoe* rule, which bars antitrust defendants from asserting the affirmative defense that direct purchasers who pass on an overcharge cannot sue for damages. In reaching this holding, the court examined the text and early history of the Cartwright Act, legislative amendments to the law, as well as policy considerations. Among these policy considerations, the court determined that allowing a pass-on defense would hamper enforcement of California's antitrust laws because it "would plunge parties and courts into minitrials attempting to trace every penny of an initial overcharge." *Clayworth*, 49 Cal. 4th at 784. The court reconciled this concern about complexity with the state's *Illinois Brick* repealer statute, which invited complexity:

> While the Legislature when it enacted the *Illinois Brick* repealer statute imposed that task for the small universe of cases in which multiple levels of purchasers might sue, rejection of the *Hanover Shoe* rule would extend that burden to nearly every case. Accepting the rule, in contrast, streamlines antitrust trials, renders the process of proving antitrust damages less daunting, and ultimately enhances enforcement.

*Id.* At best, the *Clayworth* court's brief discussion of complexity concerns is applicable where such complexity frustrates enforcement of California's antitrust laws; in other words, where it imposes additional burdens on a plaintiff's ability to prove antitrust damages. That particular concern is inapplicable here because allowing Plaintiff to pursue its umbrella damages theory in no way imposes a burden on Plaintiff. If anything, allowing umbrella damages actually *promotes* the policy concern identified in *Clayworth* since the availability of umbrella damages is an additional incentive for an injured party to file suit.

Because the Court concludes that umbrella damages under the Cartwright Act are not barred as a matter of law as too inherently speculative, Defendants' motion for partial summary judgment is accordingly DENIED on this basis. Defendants may renew their challenge to Plaintiff's damages claim upon a fuller factual record and with reference to Plaintiff's actual evidentiary showing.

//

**B.     Whether Plaintiff Lacks Standing under the Cartwright Act**

Section 16750(a) of the Cartwright Act, as noted above, authorizes anyone "injured in his or her business or property" by actions forbidden under the Cartwright Act to sue for damages. As an initial matter, the parties dispute what test governs a plaintiff's standing to sue under the Cartwright Act. (*Compare* Dkt. No. 135 at 9 (Plaintiff asserting that it need only show that the violation was the proximate cause of injuries and that it is within the "target area" of the antitrust violation), *with* Dkt. No. 133 at 8 (Defendants contending that the Supreme Court's test for antitrust standing in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") applies).)  The issue has not been explicitly addressed by any California state court, and courts in this District have reached different conclusions. *Compare In re Dynamic Random Access Memory (Dram) Antitrust Litigation*, 516 F. Supp. 2d 1072, 1088-89 (N.D. Cal. 2007) (applying *AGC* to indirect purchasers' Cartwright Act claims), *with In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) ("The Court agrees with Judge Alsup that it is inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the [*Illinois Brick*] repealer states' laws in the absence of a clear directive from those states' legislatures or highest courts"), *and In re Optical Disk Drive Antitrust Litigation*, 2011 WL 3894376, at *11-12 (N.D. Cal. Aug. 3, 2011) (same).  Nevertheless, the Court finds that even if the *AGC* test did apply, Defendants have not shown that Plaintiff lacks standing as a matter of law.  Under *AGC*, courts consider (1) the nature of the plaintiffs' injuries and whether the plaintiffs were participants in the relevant markets; (2) the directness of the alleged injury; (3) the speculative nature of the alleged harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.  459 U.S. at 536–39.

The only factor Defendants discuss is the third factor regarding the speculative nature of the harm.  As already discussed above, Plaintiff's umbrella damages claim is not inherently speculative; thus, for the same reasons it is possible for Plaintiff to produce non-speculative evidence that Defendants' conduct caused a price umbrella, the Court concludes that the speculative nature of the alleged harm does not warrant a finding that Plaintiff lacks standing.  The other factors, which Defendants do not address, also do not support a finding that Plaintiff lacks

10

standing. It is undisputed that Plaintiff was, and is, a participant in the relevant market. Further, the nature of Plaintiff's injuries caused by the alleged price umbrella have been recognized by other courts as "antitrust injuries," at least under federal law. *See, e.g.*, *U.S. Gypsum Co. v. Ind. Gas Co., Inc.*, 350 F.3d 623, 627-28 (7th Cir. 2003) ("A cartel cuts output, which elevates price throughout the market; customers of fringe firms (sellers that have not joined the cartel) pay this higher price, and thus suffer antitrust injury, just like customers of the cartel's members."). Regarding the fourth factor, the parties do not discuss the risk of duplicative recovery in this action, and such a risk is not readily apparent to the Court given the lengthy procedural history of the case. Finally, and for the reasons discussed above, apportioning damages to Plaintiff in this case is not impermissibly complex simply because Plaintiff alleges umbrella damages.

## CONCLUSION

For the reasons stated above, Defendants' motion for partial summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated: August 20, 2014

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge